## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HARTFORD CASUALTY INSURANCE COMPANY, | Civ. No. 10-6235 (KM) (JBC) |
| Plaintiff, | OPINION |
| v. | |
| PEERLESS INSURANCE COMPANY et al., | |
| Defendants. | |

### KEVIN MCNULTY, U.S.D.J.:

This case requires the Court to review the defense and settlement on behalf of Carquest Corporation in a 2007 action presided over by District Judge Wigenton and Magistrate Judge (later District Judge) Salas[1] in this Court. *Mechin v. Carquest Corp.*, 07-cv-5824 (D.N.J.) (the "Mechin action"). In the Mechin action, a young man sued Voltec Industries, LLC ("Voltec"), TMC/Tasco, and three interrelated Carquest entities—Carquest Corporation, Carquest Products, Inc. ("CPI"), and BWP Distributors, Inc. ("BWP")—for injuries resulting from a garage accident involving a Carquest Trouble Light. Hartford defended Voltec, TMC/Tasco, Carquest Corporation, CPI and BWP, taking on the Carquest entities as additional insureds on its Voltec Policy. Eventually, the Mechin case settled. Voltec agreed to pay $900,000; TMC/Tasco, $1,750,000; and the Carquest entities, collectively, $2,050,000. The dispute here is whether responsibility for that $2,050,000 should be allocated evenly among the three Carquest entities, or some other way. Why would these related corporations care? Actually, they apparently don't, and, to the chagrin of Peerless, that indifference seems to be reflected in the

---

[1] Judge Salas became a district judge in 2011.

evidentiary record of the Mechin action. The problem here is that the three Carquest entities have separate insurance carriers, to whom the allocation makes a great deal of difference. Hence this action, in which the parties are insurance carriers.

While the Mechin Action was still pending, Hartford (which assumed the defense of all three Carquest entities) filed this action seeking a declaratory judgment against Carquest Corporation's primary insurer, Peerless Insurance Company ("Peerless"), as well as the insurers of BWP and CPI. BWP's and CPI's insurers have settled, but the dispute between Hartford and Peerless remains. Peerless (along with other insurers) has filed a counterclaim against Hartford for breach of fiduciary duty, negligence, and breach of contract.

An additional recurring issue in this litigation relates to indemnification. In the Mechin action, before Hartford undertook the defense of the Carquest entities, Carquest Corporation and CPI individually filed claims for contribution and indemnification against Voltec. Later in the case, they moved for summary judgment, arguing that Voltec and TMC/Tasco must indemnify them under the provisions of a contract between Voltec and CPI. Voltec cross-moved for summary judgment with respect to the Carquest entities' indemnification claim. Judge Wigenton, finding the language of the indemnification agreement to be insufficiently clear, granted Voltec summary judgment and dismissed the indemnification claim. In this action, Peerless has attempted to relitigate that issue.

I have gleaned the following claims from the complaints (DE 1, 27), Judge Wigenton's docket, and the joint pretrial order (DE 219). To summarize, the claims now before me are:

- Hartford's claim for one-third of the defense costs and one-third of the indemnity cost paid on behalf of the Carquest entities in settling the Mechin action. Peerless, in response, asserts estoppel. Hartford, it says, unfairly pursued a defense strategy that neglected (a) the indemnity

claim of its insured, Carquest Corporation, against Voltec,[2] and (b) arguments that Carquest Corporation bore no responsibility for the injury. Peerless further asserts that, even if contribution is appropriate, a one-third allocation is not reasonable.

- Peerless's claim against Hartford for breach of its fiduciary duty to Carquest Corporation (and, by extension, Peerless).
- Peerless's claim against Hartford for breach of its insurance contract for failing to appoint independent counsel for Carquest Corporation.
- Peerless's claim that Hartford was negligent in its control and management of the defense of the claims against Carquest Corporation.

Between the dates of December 3, 2018 and December 11, 2018, I held a bench trial on all outstanding factual issues.[3] The court heard testimony, both from live witnesses and via read-ins from depositions.[4] Each party was afforded

---

[2] Peerless also seeks a ruling as to whether Hartford assumed the defense based on the contractual indemnification provision deemed ineffective by Judge Wigenton.

[3] The pages of the five volumes of the trial are numbered sequentially, and so are cited merely as "Tr. __." For ease of reference, the volumes of the transcript are as follows:

| | |
|---|---|
| Vol. 1 (pp. 1–248) | [DE 244] |
| Vol. 2 (pp. 249–529) | [DE 245] |
| Vol. 3 (pp.530–799) | [DE 246] |
| Vol. 4 (pp. 800–1086) | [DE 247] |
| Vol. 5 (pp. 1087–1316) | [DE 248] |

[4] At the bench trial, the court heard testimony from the following witnesses:

*Hartford:*

John Maucher, Esq. (Tr. 44–528)

Donna Jones, Ohio Cas. (Tr. 532–798)

Thomas Mulcahy, Esq. (Tr. 803–1024)

Jon C. Connor, Zurich Insurance (dep. read-in) (Tr. 1025–31)

Dan DeMerchant, Hartford Casualty (dep. read-in) (Tr. 1031–47)

Margaret Gagner, Ohio Cas. (dep. read-in) (Tr. 1047–68)

Len Herman, Esq. (dep. read-in) (Tr. 1068–71)

the right to cross-examine as appropriate. Exhibits were introduced in evidence. The parties were given the additional opportunity to designate and submit deposition excerpts from this action and the underlying Mechin action.

## I.   FINDINGS OF FACT

### 1. The Mechin Action

1.   Jean Mechin, an auto mechanic, suffered burn injuries when a gas tank toppled onto a "Professional Duty Carquest Trouble Light," igniting gas that had spilled on Mechin's clothing. Pl. Exs. 374, 117, 108; *see also* Stipulated Facts ¶ 5.[5] As a result of the accident, Mechin was in a coma for four weeks and was left with permanent scarring on his neck, upper extremities, torso, and hands. Pl. Ex. 374, 117, 108. Aside from permanent disfigurement, he also suffered psychological injuries. 4T 841:17-849:13; Pl. Exs. 117, 259.

---

Mary Jane Jeter, Hartford Cas. (dep. read-in) (Tr. 1071–84)

Frederick Kotcher, consultant (dep. read-in) (Tr. 1089–1106)

Robert Wicker, Esq. (dep. read-in) (Tr. 1106–1113)

*Peerless*:

Margaret Gagner, Ohio Cas. (dep. read-in) (Tr. 1127–42)

John Giarrizzo, Hartford Cas. (dep. read-in) (Tr. 1142–66)

Jacques Georges, Hartford Cas. (dep. read-in) (Tr. 1167–77)

Patrick Scherer, Hartford Cas. (dep. read-in) (Tr. 1177–90)

Daniel DeMerchant, Hartford Cas. (dep. read-in) (Tr. 1190–1209)

Mary Jane Jeter, Hartford Cas. (dep. read-in) (Tr. 1209–29)

Daniel Lewis, CPI/Carquest Corp. (dep. read-in) (Tr. 1229–1237)

Robert Wicker (dep. read-in) (Tr. 1237–45)

Len Herman (dep. read-in) (Tr. 1245–62)

Frederic Kotcher (dep. read-in) (Tr. 1262–1307)

[5]   "Stipulated Facts" = Stipulated Facts from Joint Pretrial Order [DE 219]

Exhibits submitted by the parties are cited as "Pl. Ex." and "Def. Ex."

2.     In December 2007, Mechin sued Carquest Corporation, alleging his injuries were the result of "the "the Carquest Trouble Light being defectively designed, manufactured, distributed, sold," and asserting breach of express warranty. Pl. Ex. 99; *see also* Stipulated Facts ¶ 6. Mechin sought recovery under the New Jersey Product Liability Act, N.J. Stat. Ann. § 2A:58C-1, *et seq.* Under the NJPLA, liability can attach to those who manufacture, sell or market defective products. Ex. 398; Stipulated Facts ¶ 8.

3.     In April 2008, Mechin amended his Complaint to name CPI, Tasco, Voltec, and BWP Industries, Inc. ("BWP"). Pl. Ex. 99; Stipulated Facts ¶ 7.

4.     When they first entered appearances in the Underlying Action, Carquest Corporation, CPI, BWP, and Voltec each had separate counsel, appointed by their respective insurers. Stipulated Facts ¶ 9.

5.     At the outset of the action, the defendants' insurance coverage was as follows:

- **Voltec** had business liability insurance with a primary coverage (limited to $2 million per occurrence) and an umbrella coverage (also limited to $2 million per occurrence) from **Hartford**. (Hartford also issued insurance to TMC.)

- **Carquest Corporation** held commercial general liability insurance from, collectively, **Peerless**.[6]

- **CPI** held both a commercial general liability insurance and umbrella coverage from Universal Underwriters Insurance Company ("**UUIC**").

- **BWP** held commercial general liability insurance from Zurich American Insurance Company ("**Zurich**").

Stipulated Facts ¶ 10.

---

[6]     Carquest Corporation held primary coverage from the Netherlands Insurance Company (a member of Ohio Casualty) and umbrella insurance coverage from The Indiana Insurance Company (also a member of Ohio Casualty). All are under the umbrella of Peerless, defendant here.

## 2. Peerless initially controls Carquest Corporation's defense

6.     On August 4, 2008, Carquest Corporation asserted a cross-claim against Voltec for contractual indemnification. Def. Ex. 26; 4T.991:18-992:2.

7.     Carquest Corporation also asserted a cross-claim against BWP. Def. Ex. 26; 4T.991:18-992:20.

8.     When Peerless controlled the defense of the Mechin Action (from its outset to April 2009), Peerless did not seek dismissal or move for summary judgment on behalf of Carquest Corporation. 5T.1093:7-15; Kotcher Dep. at 31:21-32:23; 38:5-13; Gagner Dep. at 66:4-8.

### 3. Contract between Voltec and CPI, and the Carquest entities' tender to Hartford

9.     In early 2008, Carquest Corporation, CPI and BWP (the "Carquest entities") sought coverage from Hartford, referencing the supply contract between Voltec and CPI and the indemnification provision therein. Def. Ex. 19. The Hartford policy provided coverage for "vendors" as additional insureds by contract. Policy, Business Liability Coverage Form, Sec. C(6)(a), Pl. Ex. 400. The contract also included Section 2.4, titled "Indemnification," which stated:

> (a) The Supplier shall indemnify and hold harmless the Company, CARQUEST Corp. and each Member against any and all liabilities, losses, damages, costs, and expenses, including court costs and reasonable attorney's fees, that the Company, CARQUEST Corp. or any Member may incur or sustain by reason of any claim, demand, legal actions or judgment based upon or arising out of (i) any alleged or actual misappropriation or infringement by the Supplier of the trade secrets, patent rights, trademarks, copyrights or other industrial property rights of others in connection with the Supplier's manufacture and/or sale of the Products, or (ii) any alleged or actual defects of any kind in the design, manufacture, preparation, or handling of the Products; provided that the Supplier shall not be liable for the gross negligence or willful misconduct of the Company, CARQUEST Corp. or any Member. The Supplier agrees to defend any claim, demand, action, suit, or proceeding brought against the Company, CARQUEST Corp. or any Member insofar as such claim, demand, action, suit, or proceeding is based upon or arises out of the matters referred to in this Agreement; provided that, upon the Supplier's assumption of such defense, the Supplier shall not be liable for any attorney's fees of the Company, CARQUEST Corp. or

any Member. The Company, CARQUEST Corp. or any Member claiming indemnification hereunder shall provide prompt notice to the Supplier of any claim, demand or legal action in respect of which indemnification may be claimed; provided that the failure to provide such notice shall not release the Supplier for any liability except and solely to the extent that the Supplier is materially prejudiced by such failure. The Supplier shall not be liable for any settlement without its prior written consent.

Def. Ex. 7.

10.     On January 31, 2008, Hartford denied the Carquest entities' tender. Def. Ex. 19.

### 4. Hartford assumes the Carquest entities' defense

11.     In April 2009, Hartford accepted the tender of the Carquest Entities and assigned Thomas Mulcahy, Voltec's counsel, to also represent Carquest Corporation, CPI and BWP. Stipulated Facts ¶ 11; 4T.1036: 5-1037: 1; DeMerchant Dep. at 38: 3-39: 4. Hartford did not offer the Carquest entities, separately or collectively, the option of separate counsel. 5T.1164:9-25, 1199:4-1200:1.

12.     Hartford asserts that it accepted the tender under the "vendors" provision. In its acceptance, Hartford noted that all of the Carquest entities had sought coverage as "additional insured" and stated that its coverage would be subject to all policy terms. Peerless states that Hartford accepted tender in a different letter, dated April 3, 2009. Def. Ex. 33. In that letter, Giarrizzo writes:

> The Hartford will agree to indemnify and defend Carquest against any and all claims of the plaintiff, Jean Michael Mechin, and will assume Carquest's defenses and dismiss all cross-claims against said entities subject to a full reservation of rights which would allow The Hartford to disclaim its coverage obligation to Carquest in the event discovery reveals that the subject product at issue in this litigation is proven not to be a product imported and distributed by any of the The Hartford's named insured's entities.

Def. Ex. 33.[7]

13.   Mechin, the plaintiff, was represented by David Mazie, Esq. Pl. Ex. 398.

14.   Mulcahy described Mazie as "a very capable opponent. He's a formidable plaintiff's lawyer." 4T.814:5–6. John Maucher, Mulcahy's successor as the Carquest entities' lawyer, described Mazie as "very professional [—] he knew what he was doing." 1T.56:19–20.

15.   Peerless asserts that Hartford employees responsible for overseeing the defense of the Carquest entities were "confused" about the respective roles of the companies in the marketing and sale of the Trouble Light. 1T.169:16-24; Pl. Ex. 80; 4T.1073:11-20, 1076:13-18, 1077:16-24, 1079:1-5; 5T.1222:2-1223:3. Peerless also notes that, at the outset of the Mechin action, a Hartford representative had a conversation with Frederick Kotcher (*see* ¶ 18, *infra*) in which Kotcher stated that Carquest Corporation was wrongly named as a defendant and had not participated in the chain of distribution. 5T.1304:5-1307:19.

### 5. Innocent seller defense

16.   Voltec, Carquest, CPI, and BWP assured Hartford that none of them had been materially involved in the marketing, labeling, warnings, design or manufacture of the Trouble Light. DeMerchant read-in, 4T.1037:4-12; DeMerchant Dep. at 42: 21-43: 6; Herman Dep. at 5-50: 13; 118: 23-120: 7; Kotcher Testimony, 5T.1094:3-11; Kotcher Dep. at 90:8-94:23.

17.   Thus, the Carquest entities, through Mulcahy and, later, John Maucher, pursued an "innocent seller" defense. 4T.811:18-812:14; Pl. Exs.

---

[7]   Hartford cites to Def. Ex. 19 (described as Giarrizzo letter, 4/17/09), which I have been unable to locate in the record.

117, 127,[8] 492.[9] Gagner, who monitored the file at Peerless, Pl. Ex. 65, 66, understood that Mulcahy was pursuing a joint "innocent seller" defense. Gagner Dep. at 108:18-109:25. She did not raise an issue of conflict with Mulcahy pursuing the joint defense. 4T.1049:19-1050:16; Gagner Dep. at 88:23-89:25.

### 6. Overlapping principals of the Carquest entities

18.     Frederick Kotcher served as the principal for Carquest Corp. and CPI. 5T1091:7-23, Kotcher Dep. at 24:10-22; Wicker Dep. at 26:6-17. Kotcher was Vice President of Corporate Administration for General Parts of Raleigh, NC. Kotcher Dep. at 19:18-20:24. During the Mechin Action, Kotcher served as an outside consultant to General Parts, Carquest Corporation and CPI. 5T.1089: 23-1091:4. Kotcher is not a lawyer. 5T.1089: 18-20; Kotcher Dep. at 13:7-24:1.

19.     Robert Wicker was the General Counsel for General Parts International ("GPI"). GPI's subsidiary is General Parts, Inc., which along with BWP and other subsidiaries, were the shareholders of Carquest Corporation. Wicker's role was to advise Frederick Kotcher. 5T.1106:21-1107:1; Wicker Dep. at 19:12-24:12; 26:6-17.

20.     Len Herman, an independent lawyer, was officially the principal for BWP throughout the Mechin action. 4T.1068:14-21, Herman Dep. at 11:18-12:21.

21.     When Mulcahy represented the defendants, and at the beginning of Maucher's representation, Herman acted as the primary contact for the three Carquest entities: Carquest Corp., BWP, and CPI. 4T.816:20-817:14; lT.63:24-64:8; 1T.68:19-69:7; 4T.1031:25-1032:16; *see also* Exs 311, 312, 116. Herman

---

8     Pl. Ex. 127 is Defendants' Statement of Material Facts to the Mechin Summary Judgment Motion, admitted without objection.

9     Pl. Ex. 492 is the confidential settlement conference memo of Carquest Corporation, CPI, and BWP. Because the settlement process and the reasonableness of the settlement are the very substance of this action, it is admissible.

attended most depositions in the case and every deposition for the Carquest, BWP, and CPI witnesses. 4T.817:15-818:11.

22.   Kotcher consulted with both Wicker and Herman regarding the Mechin action. 5T.1092:13-1093:2. Kotcher Dep. at 27:7-28:1; 24:23-25:1; 260:4-261:16.

23.   Kotcher testified that Carquest Corp. and CPI coordinated their defense with BWP throughout the Mechin action. 5T.1092:2-9, Kotcher Dep. at 25:12-20.

### 7. Thomas Mulcahy, Esq.

24.   Defense Counsel Thomas Mulcahy has handled over 500 civil bodily injury cases for Hartford and other insurers. 4T.806:11-25. He has never been brought before the Committee on Professional Responsibility. 4T.807:22-24.

25.   Mulcahy testified that, during his time representing the Carquest entities, there was no discord among those entities regarding his defense strategy. 4T.873:4-14.

26.   At one point, Voltec and the Carquest entities were in disagreement over whether to file a third-party complaint against Firestone, Mechin's employer. Pl. Exs. 311, 111; 4T.816-5-820:23. However, by March 2, 2010, Mulcahy reported that Voltec and Carquest agreed that there was insufficient evidence to sue Firestone. Pl. Ex. 117, at 6.[10]

27.   At the beginning of Mr. Mulcahy's representation, Herman was concerned about the fact that one law firm was representing all of the Carquest entities and Voltec. Pl. Ex. 117. That issue became heightened when it was disclosed that TMC/Tasco, which has the same owner as Voltec, had a close relationship with the importing company. Pl. Ex. 117. *See* Miller Dep. at 8-30. However, once the litigation went into discovery, Herman was "on board" with

---

[10]   TMC/Tasco would bring a third-party complaint against Firestone, which was denied. Pl. Ex. 205.

the defense strategy that all three Carquest entities should press an "innocent seller" defense. 4T.873.12-19.

### 8. Deposition testimony during Mulcahy's representation regarding the roles of the Carquest entities

28.   During discovery, Mulcahy prepared the witnesses to be detailed and explicit as to what the respective roles of the corporations were. 4T.959:3-12. However, as described *infra*, those very witnesses created confusion as to each Carquest entities' role in the marketing and chain of distribution for the Trouble Light. Generally, the witnesses did not clearly distinguish between the Carquest entities and often times mixed up their names. *See infra* ¶¶ 27–33.

29.   Peerless has submitted significant evidence to demonstrate that Carquest Corporation did not participate in marketing or the chain of distribution. Nevertheless, evidence existed in the record of the Mechin action that would tend to implicate Carquest Corporation.

30.   Dan Lewis, the CPI Market Director and corporate designee (Lewis Dep. at 5), created uncertainty as to:

(a) the specific role each Carquest entity played in marketing and labeling the Trouble Light, *id.* at 57:16-58:5, 89:9-25; 90:3-6, 109:4-9;

(b) the relationships among the Carquest entities, *id.* at 6:1-8, 13:1-14:24, 25:12-19, 32:1-17, 47:13-48:25; and

(c) Carquest Corporation's role in the chain of distribution. *Id.* 60:13-61:22, 90:7-16.

31.   The witnesses from BWP marketing added to the confusion regarding Carquest's Corporation's role in marketing the product. Manno Dep. at 7-8, 11; Pallai Dep. at 24-25, 26:21-25.

(a) Gaic Manno, the Carquest Marketing Manager at BWP, testified that, to advertise the 81829 Trouble Light, he took and paraphrased language from the Carquest service line catalog and included it in a flyer, Manno Dep. at 11; at another point, Manno had testified that Carquest corporation puts out the Carquest catalogs and commercial advertising. *Id.* at 7.

(b) Richard Pallai, Vice President of Marketing at BWP, testified that BWP, another Carquest member, or an independent Carquest store could have made a flyer regarding the 81829 Trouble Light. Pallai Dep. at 24-25.

32.     The witnesses from Voltec also created confusion by using "Carquest" as a catchall term for all three entities, or for CPI. Miller Dep. at 56-58, 81:17-21, 98-99, 101:19-102:8; Wray Dep. at 33:16-21.

(a) Thomas Miller, the founder and owner of TMC/Tasco and Voltec, *see* Miller Dep. at 8-30, stated that Voltec sold the trouble light to "Carquest." *Id.* at 56-58. Miller stated that he was not aware of any instances in which TMC/Tasco or Voltec sold their products to CPI. *Id.* Miller also testified that, as he understood it, "Carquest" sold the trouble light to Firestone. *Id.* at 98-99. Further, Miller testified that "Carquest" created the actual packaging on the box for Trouble Light. *Id.* at 81:17-21.

(b) John Wray, Vice President of Sales for the Automotive Division of Voltec, testified that Voltec sells to Carquest Products Incorporation (CPI). Wray Dep. at 33:16-21. Wray testified that "Carquest" designed the packaging, then specified that Carquest Products "designed it and provided the designs back to us." *Id.* at 53:6-54:14. At points in his answers, Wray would use the name "Carquest," as opposed to CPI or Carquest Products. *See e.g., id.* Further, Wray testified that he did not know who owned "Carquest, CPI, or BWP;" he then stated CPI is owned by Carquest and, by common knowledge in the marketplace, BWP is an independently owned Carquest distributor. *Id.* 34:1-22.

33.     During this bench trial, Mulcahy stated that he did not ask questions after Mazie concluded his examination. In his view, doing so would have been a classic young lawyer's mistake; it would only confuse the client and dig "a deeper hole." 4T.915:16-916:13.

### 9. Mulcahy's reports

34.     Mulcahy sent two reports to Hartford providing updates on the state of the case. Pl. Exs. 117; 107.

35.     Margaret Gagner, the Peerless adjuster, was copied on both of Mulcahy's letter reports, and both were re-sent to her on March 30, 2010. Pl. Ex. 67. Mulcahy testified that he never received criticism from Gagner. 4T.873.9-11. At no time did Gagner request that separate counsel be retained to defend Carquest Corporation. 4T.1051:25-1052:4.

### i.  March 2, 2010 report

36.     On March 2, 2010, Mulcahy reported to Hartford on the state of the case. Pl. Ex. 117. Mulcahy wrote:

> In my opinion, our Carquest clients are somewhat vulnerable in this litigation arising from the degree to which they claimed to know nothing about the testing which may or may not have been performed . . .Those lights were marketed under the Carquest brand, but the Carquest entities have done essentially no testing on the product relative to their safety.

Pl. Ex. 117 p. 20.

### 1.  Mazie's strategy

37.     Mulcahy reported that one of Mazie's theories was that "as an entity that markets its products under the Carquest brand" to service station customers, the Carquest-related companies had a duty to sell products that could be safely used in that work environment. Pl. Ex. 117, p. 3. Mulcahy also reported that Mazie was attempting to prove that the Carquest companies were not mere distributors, but rather were "branding" the product, indicating that they should be held to the same standard as companies that designed or manufactured the lights. *Id.* p. 5.

38.     Mulcahy reported that the there was no real challenge "to the fact that [the Trouble Light] was a Carquest product," and that the Trouble Light "came through the Carquest distribution chain of Carquest Corp., CPI and BWP . . ." Pl. Ex. 117 at 10.

39.     Mulcahy also reported on the anticipated strategy of the plaintiff to extend liability to all three Carquest entities:

13

It became fairly clear throughout these depositions that plaintiff's counsel, David A. Mazie, is going to come after those entities which were responsible for the Carquest brand because of the extent of the Carquest brand business . . . Mr. Mazie will attempt to use the extent of the Carquest empire to justify the argument that **if you are going to put your name on a product, you should at least have some knowledge of the testing** associated with the product and the arguable dangers associated with its use under certain circumstances. I am of the opinion that this is not a bad argument on plaintiff's behalf.

Pl. Ex. 117 at 24.

### 2. Deposition reports

40.     Mulcahy also reported that, by the time of Lewis's deposition, "it had become clear that Carquest had at least some input into the marketing materials and packaging for the drop light at issue." Pl. Ex. 117 at 19.

41.     Pallai, Mulcahy reported, made a decision to include the Trouble Light in the Carquest product flyers that are distributed throughout the nation. *Id.* p. 22. Mulcahy further recounted Pallai's deposition testimony that BWP was responsible for preparing the flyers, but that Carquest Corporation was responsible for the creation of the brochures which had been previously marked. *Id.*

42.     On March 29, 2010, Mulcahy reported to Hartford that the UL Certification for the Trouble Light was incorrect. Pl. Ex. 107, at 3. Further, Mulcahy reported, the Carquest witnesses testified that they had relied on Voltec and TMC/Tasco's representations that the Trouble Light was suitable for the automotive service environment, *id.*, but the product had only been tested for "general use." *Id.* at 2-3, 9 (citing John Herschbach, a UL expert, who posited that the Trouble Light was not appropriate for the automotive service station environment).

### 10.     Mulcahy's testimony in this action

43.     By the end of March 2010, although discovery was not finished, Mulcahy believed that it was extremely unlikely that he could obtain summary judgment for any of the individual Carquest entities, because there was enough evidence relating to each of the three to create a triable issue. 4T.909:22-410:6.

14

Mulcahy also found Lewis's deposition to be inconsistent. *Id.* 907:1-9. In Mulcahy's experience, "it doesn't take much for a summary judgment to be denied by a Court if there's any level of inconsistency in the factual testimony." *Id.* 907:7-9.

44.    Mulcahy believed that Mazie's goal was "definitely attacking [the Carquest entities] as an enterprise." 4T.861:8-12. Illustrating the point, he testified as follows:

> As we dealt with individual representatives at depositions, he would ask that particular person who came from one or the other of the Carquest entities you know, specifically what that entity did in connection with the product just to give himself some background. But I mean, [Mazie], as is the case with most plaintiff attorneys, didn't really care where the responsible specific mistake may have been made within the entities. It was in his interest . . . because Carquest was such a well-known brand, as being responsible for the marketing of this product. . . . It was pretty apparent that he was going to have an expert who was going to say that this particular light was inappropriate for this particular application.

4T.861:8-826:3. *See also* 4T.959:24-960:5.

45.    Mulcahy was concerned that Mazie's deposition questioning signaled an attack on choices to market the Trouble Light to garages and to place the "Carquest" label on the Trouble Light without testing or having knowledge of testing. 4T. 867:16-868; 868:19-869:6; 4T.883:2-21; 4T.884:24-885:23; *see also* 4T. 869:3-6.

### 11.    Decision to split off the Voltec file

46.    In early April 2010, Hartford adjuster Daniel DeMerchant determined that there was a potential conflict between the Carquest entities and Voltec. The conflict arose from past disagreements about suing Firestone, DeMerchant Dep. at 47:7-48:23, and the discovery that the Carquest entities had some role in marketing the trouble light, including the placing of the "Professional-Duty" label on the box. 45:8-46:17. Thus, he decided to split the file and retain separate counsel as between the Carquest entities and Voltec.

*Id.* at 47:7-48:23. Hartford allowed the Carquest entities to choose their counsel. Pl.. Ex. 44; 4T.1040:20-1041:2, 1041:15-1043.

47.    Len Herman disagreed with the decision to split the defense. *Id.*

### 12.    Maucher's representation of the Carquest entities

48.    As their new, separate counsel, the Carquest entities chose John Maucher of Mintzer Sarowitz, the firm which had defended BWP during the first year of the case. Pl. Ex. 119, 294. Hartford paid Mintzer Sarowitz $159,230.07 in total for the defense of the Carquest entities. Pl. Exs. 3, 16–27.

49.    John Maucher has practiced as a civil defense lawyer in New Jersey since 1995, and during that time he has tried ten cases before a jury. Maucher specializes in bodily injury cases. 1T.44:5-46:12. Maucher has never been sued for malpractice, sanctioned, or brought before the Committee of Professional Responsibility. *Id.*

50.    At the beginning of his representation, Maucher's client contact was Herman; he reported to Herman with the understanding that Herman spoke for all three Carquest entities. 1T.63:10-64:8. Later, Maucher reported to Herman, Kotcher, and Wicker jointly. 1T.69:4-1.

51.    As for the insurance carriers, Maucher reported to Scherer and Jeter at Hartford, and to Margaret Gagner and her successor, Donna Jones, at Peerless. 1T.53:5-23, 85:5-86:16, Pl. Ex. 68 (Maucher reaching out to Gagner to discuss the transfer of the case).

52.    Maucher found that Jeter and Scherer paid attention to the file, and that Jeter would send follow-up e-mails whenever he sent a report. 1T.176:7-15. That being said, many times, Maucher communicated with his clients and other insurers without copying Hartford. Pl. Exs. 76, 83, 84, 124, 143, 145, 155, 181, 220, 221, 222.

### 13.    Maucher's relationship with the Carquest entities

53.    The Carquest entities never requested separate counsel, nor did they advise Maucher that he had a conflict of interest. 1T:49:6-25, 50:7-12, 132:5-9; Herman Dep. at 142:6-144:15, 184:8-10, 313:5-315:4; 5T.1108.4-11.

54.     Maucher testified that none of the Carquest principals expressed a disagreement over his defense strategy. 1T.49:22-50:6, 189:16-20. *See also*, 5T.1092:2-9. Further, he testified, none of the entities' principals ever proposed that they assert cross-claims against each other. 1T:50:13-16. Nor did they ever request that Maucher cease using "Carquest" as a short-hand designation for all three entities. 1T.192:13-193:3. From Maucher's perspective, the Carquest entities "were pretty much a team." 1T.189:14-15.

55.     Although paid by Hartford, Maucher acted as independent defense counsel for the Carquest entities. 2T.254:11-255:16; Pl. Ex. 8; 1T.54:8-55:10.

### 14.     Maucher's June 26, 2010 status report

56.     On June 26, 2010, Maucher submitted a status report to Hartford. Pl. Ex. 74. Maucher reported that the plaintiff's case would focus on the fact that the drop lights "should not be marketed for use by service or repair facilities, such as Firestone." *Id.* Maucher noted that Carquest depositions revealed that the drop light was marketed to the service and repair industry through "flyers, in store brochures and pamphlets, etc." *Id.* Discussing manufacturing and the chain of distribution, Maucher reported that "[a]fter TMC/Tasco brings the product into the country Voltec distributes it to numerous other companies, including Carquest, CPI and BWP." Pl. Ex. 74 at 1587.

57.     Maucher estimated likely jury verdicts as follows; if the plaintiff prevailed on most or all issues, $2,000,000 or more; if the defense prevailed on most or all issues, $750,000 maximum; and if an average outcome, $1,300,000. *Id.* at 1590. In his verdict comments, Maucher warned:

> Although this case does not appear to be strong for the plaintiff in regard to liability, the jury will be sympathetic since the plaintiff was a 20 year old young man who will share no blame for his accident. Whether or not the jury finds that the defendants were negligent and/or breached the New Jersey Products Liability Act, they will surely feel sorry for the plaintiff. Therefore, the jury may fit the facts to reach the outcome which they believe is just; which will be a verdict on behalf of the plaintiff to help him cope with the lifelong burden of being disfigured.

Pl. Ex. 74 p. 1590.

58.     Throughout the case, Mazie continued to push the argument that the Trouble Light "was not suitable for the application it was marketed and sold to." 1T.92:19-93:6. Mazie continued to press the point that the Carquest entities were not aware of the product testing in the way that they should have been. 1T.73:8-74:1.

### 15.     July e-mails between Maucher and Gagner

59.     On July 9, 2010, Maucher reported that Voltec's counsel sought depositions of the Carquest entities employees. That request "baffle[d]" Maucher; he believed such discovery "would make plaintiff's case and potentially uncover acts of negligence by a co-defendant covered by the same insurance." Pl. Ex. 70 at 1786.

60.     In reply to Maucher's e-mail, Gagner wrote that, when the matter first started, Kotcher explained that Carquest did not sell any products and its role "was simply to license the brand and/or trademark and sell to their distributors." *Id.* at 1785. During the bench trial before this Court, Maucher testified that, whether that was true or not, depositions had created a factual issue as to whether Carquest's role was strictly one of licensing. 1T.107:2-22. Maucher commented, "[a]ll it took was for a witness to say otherwise; because it didn't matter what I thought, it's what the witnesses believed, would testify to." *Id.*

### 16.     Maucher's July 21, 2010 report

61.     On July 21, 2010, Maucher sent a second report to Hartford, copying Herman and Jeter, among others. Pl. Ex. 71. Maucher reported that the Trouble Light was not tested for use in commercial settings, *id.* ¶ 1. Maucher also attached photographs of Mechin's injuries, some of which he described as "rather shocking." *Id.* ¶ 2.

62.     Maucher reported that, after performing a jury verdict search, the program he used predicted a $12 million settlement value or a $15 million jury verdict. *Id.*

63.    Maucher reported that he previously believed that a fair settlement in this case would be a net of $2 million ($3.5 million including liens, lost wages, and attorney's fees), but Herman disagreed, saying he believed that the value of the case was significantly higher. *Id.*

64.    In his report, Maucher also noted that he had demanded Voltec's catalogs, and raised the issue before Judge Salas, but expected "a fight" from Voltec. Pl. Ex. 71 ¶ 4.

### 17.    Judge Salas's August 2010 rulings

65.    On August 5, 2010, Judge Salas, then a magistrate judge in this District, heard argument and denied pending motions to add TMC China, the Chinese manufacturer of the Trouble Light, and Firestone as defendants. Pl. Ex. 205. Judge Salas scheduled a settlement conference. *Id.* The plaintiff made a demand for $9 million. *Id.*

### 18.    Summer 2010 depositions

66.    Over the summer of 2010, Maucher defended depositions on behalf of the Carquest entities. 1T.74:15-75:8. Herman participated in the preparation of the deposed witnesses. *Id.* Maucher testified before me that he was concerned for the interests of all three Carquest entities. *Id.* Maucher testified that, upon reviewing the deposition transcripts, he was concerned to find testimony about the relationships among the Carquest entities "that was muddled, interrelated, even witnesses that weren't sure who they worked for at a certain period of time." 1T.71:13-72:1.

67.    After reviewing Pallai's testimony indicating that the members of the Carquest Corporation group also owned CPI, Maucher became concerned that it would be "hard to get a party out and say that they did nothing at all wrong [when] they're part owner of another defendant." 1T.75:22-76:8.

68.    On August 17, 2010, Scott Ginsburg, Carquest Corporation's then-Director of Advertising, was deposed. 1T.126:19-127:19. Kotcher, Herman, and Maucher prepared Ginsburg in person. *Id.* Ginsburg testified at his deposition that Carquest Corporation had a director of advertising before 2006, prepared

flyers advertising the Trouble Light, and did catalogs. Ginsburg Dep. at 10:3-24, 11:3-25; 12:1-25, 13:1-2, 14:1-8, 14:12-17, 15:3-12. Ginsburg also testified that no one else besides him at Carquest Corporation was involved in the marketing of the Trouble Light. *Id.* at 15:3-12.

### 19. Maucher's August 19, 2010 status report

69.     On August 19, 2010, Maucher reported on the recent depositions. Pl. Ex. 212. Maucher reported that fact discovery would end in mid-September and that, while the case could be won, there was the potential for a jury verdict in excess of $10 million. Pl. Ex. 212 at 4. Maucher wrote that he thought it would take $5 million to settle the case as to all defendants. *Id.*

### 20. Plaintiff's expert reports

70.     In November 2010, Mechin served two expert reports. Pl. Exs. 78, 79.

71.     Plaintiff's liability expert, John M. Tobias, P.E., stated:

> Carquest literature specifically targets the work light to commercial automotive repair facilities. This is reinforced by testimony of numerous persons affiliated with Carquest, as tabulated in the next section. In fact, the defendants list the Carquest Trouble Light to be "professional duty", which they intend to mean that the light is more appropriate for use in a commercial automobile repair facility than their other trouble lights.

Pl. Ex. 78, at 3. Tobias noted that Ginsburg had "explained that they produced an adverting flier which was directed to professional users and contained the Carquest Trouble Light." *Id.* at 4 (citing Ginsburg Dep. at 11:5-25, 25:12-15, 26:16-27:16). Tobias also noted that CPI and BWP admitted that they marketed the Trouble Light to commercial garages like the Firestone where the accident occurred. *Id.*

72.     Plaintiff's warning expert, Sam Glucksberg, Ph.D., stated in a heading that "[t]he marketing of the Carquest Trouble Light, via the Carquest products catalog/fliers and the label on the cord reel housing, invited the inference that the product was intended for use in the commercial auto repair industry." Pl. Ex. 79 at 6. Further, Glucksberg opined, "[t]he listing in the catalog for the Carquest Trouble Light appears along with various commercial

automotive products, and defendants' representatives testified that the product was specifically marketed and sold to commercial automotive repair facilities." *Id.* Maucher summarized Dr. Glucksberg's opinion in a report. Pl. Ex. 208.

73.    Maucher shared the Plaintiff's expert reports with Kotcher, Herman and Wicker. None of them stated that the report was incorrect in accusing Carquest Corporation or the other Carquest entities of being involved in the advertising and marketing of the Trouble Light. 1T.154:11-19.

### 21.    December 2010 Settlement Conference

74.    In November 2010, Maucher submitted a settlement memorandum to Magistrate Judge Salas in advance of a December 3, 2010 settlement conference. Pl. Ex. 390. In that memorandum, Maucher referred to Carquest Corporation, CPI, and BWP as "the Carquest defendants" or "Carquest." *Id.* On November 24, 2010, Maucher e-mailed a copy of the memorandum to the principals for the Carquest entities, Hartford, Peerless, and the other insurers. Pl. Ex. 390. Neither Peerless nor Kotcher protested or asked Maucher to tease out the role of Carquest Corporation individually. 1T.157:4-7.

75.    On November 23, 2010, Maucher wrote to Zurich, recommending that the case be settled prior to trial. Pl. Ex. 217 p. 4. Maucher opined that, while there was a chance that the defendants could win at trial, "we believe that a jury will find liability and will seek to award plaintiff a significant amount of money." *Id.*

### 22.    Maucher's November 27, 2010 report to Hartford regarding settlement conference

76.    On November 27, 2010, Maucher submitted a case report to Hartford in preparation for the settlement conference. Pl. Ex. 397. Maucher also sent a copy to the Carquest principals, Peerless, and the other insurers. Pl. Ex. 83.

77.    In the report, Maucher restated the possibility of a $15 million jury verdict, noting that the case research generating the $15 million estimate did not include the factor of the plaintiff's youth. Pl. Ex. 397, at 3. Maucher

explained that he meant to imply that the jury verdict could be even higher, considering Mechin's youth and life expectancy. 1T.158:15-159:5.

78.    Maucher also reported his estimate that plaintiff's counsel would expect between a minimum of $4 million and as much as $5 million to settle the case. Pl. Ex. 397 at 3.

79.    In the evaluation section of the report, Maucher opined that a "jury will find liability and will seek to award plaintiff a significant amount of money." Pl. Ex. 397 at 5. He summarized:

> There is a chance in a case like this that a jury would simply look at three different groups of defendants and split liability equally among them. . . . [U]nder the worse possible case scenario, a $15,000,000 verdict with no comparative negligence, and 33 1/3 percent liability against the Carquest defendants would mean a verdict of $5,000,000 against the three Carquest defendants. Further dividing that in 1/3 would result in a $1,667,000 judgment against BWP, CPI, and Carquest Corp. The best case scenario, would be a finding of zero liability against BWP/Carquest since they were a seller who was uninvolved in either the design, manufacturer, or warnings, and the packaging and labeling of the product did not lead to liability. **However, it would be hard for a jury to separate what the Carquest defendants did or did not do in regard to selling an unsafe product,** and given the overlap of ownership by Tom Miller with Tasco/TMC and Voltec, I believe **a jury would simply decide to *split* liability among all defendants** instead of taking the time and effort to allocate liability based upon the defendants' conduct and responsibility.

Pl. Ex. 397, p. 5 (bold text added).

80.    Maucher testified that his advice that the jury would not try to figure out what each Carquest entity did was based in part on the deposition testimony as to their status and roles, which had been "muddled and unclear." 1T.160:18-161:17.

81.    In his report, Maucher painted a picture: At the Mechin trial, he said, Mazie would make an "impassioned closing argument" and perform arithmetic on a white board totaling Mechin's pain and suffering to urge a jury verdict in excess of $29 million. Pl. Ex. 397 at 5.

82.     In his report, Maucher anticipated that Voltec would move for summary judgment, arguing that it had never physically possessed the Trouble Light and merely acted as a facilitator. Pl. Ex. 397 at 4. Maucher opined that this would be a losing argument because of the "common ownership" of Voltec and TMC/Tasco. *Id.*

83.     In the report, Maucher also predicted that, depending on the evidence that was considered, the Carquest entities had either a 50% or a 10-20% chance of winning summary judgment. *Id.* p. 7. Maucher's report concluded that, "since emotion will be the controlling aspect of the case, please believe that a huge verdict is possible against all defendants." Pl. Ex. 397 at 8.

### 23.     Post-report exchange between Jeter and Maucher

84.     Two days after Maucher submitted the November 27, 2010 report, Jeter, the Hartford adjuster, e-mailed Maucher: "It appears, from the complaint and the expert reports you have sent, that Carquest will be the primary target in this matter." Pl. Ex. 80 at 3. Jeter also asked why liability should be equally allocated to TMC Tasco, Voltec, and "Carquest" (apparently meaning, in this instance, the three Carquest entities), if "Carquest" was the prime target. *Id.* Maucher replied, affirming his view that the jury would split liability equally, but conceding that the expert reports, justifiably or not, mentioned "Carquest" more than any other party. Pl. Ex. 80 at 1–2, *See also* 1T.168:11-169:15 (Maucher's testimony at trial reaffirming his reasoning in his report).

85.     Further, Jeter expressed confusion as to Maucher's references to Carquest, Carquest Corporation, and Carquest Products Incorporated. Pl. Ex. 80 at 3. She sought clarification on the entities and their roles with respect to the Trouble Light and the Mechin action. *Id.* Maucher replied that testimony revealed that functions such as catalog product and advertising moved from "CPI to Carquest or vice versa" and that employees were transferred between those companies. *Id.* at 2. Further, Maucher said: "It seems like these corporations were interconnected and interchangeable in many respects. A jury will view all three of my clients as one entity I believe." *Id.* Maucher added that

"Carquest ran their own ads and promotions separate from the Carquest or CPI corporate ads and promotions." *Id.*

86.    Maucher's e-mail also stated that it was "undisputed that 'Professional-Duty' was coined by a Carquest person - but unknown who, when, why that phrase was first coined." *Id. See also,* Kotcher Dep. at 308:14-309:21 (stating that "Carquest" had introduced the term "professional duty"). At this trial, Maucher testified that, given those issues with the term "professional-duty," there was a question of material fact that would cause a judge to deny summary judgment. 1T.173:11-22.

87.    Maucher forwarded the exchange to the other insurers, including Peerless. Pl. Ex. 80 at 1.

### 24.    Additional reports post-settlement conference

88.    On December 4, 2010, Maucher submitted a report on the settlement conference. Pl. Ex. 259. Maucher relayed that all defendants made a collective offer of $750,000, which Voltec, TMC/Tasco, and the Carquest entities providing $250,000. *Id.* at 3. In response, Maucher reported, Judge Salas was "perturbed and stated she had no leverage to even work on the plaintiff with such a low initial offer." *Id.*

89.    Maucher also relayed Judge Salas's comment that "Carquest has a problem because the light wasn't approved for sale to commercial auto service clients with a zone of hazard and admittedly that was our market." *Id.* p. 2-3.

90.    Maucher also noted, after meeting Mechin in person, that "for the 4-5 weeks of trial the jury will see Mr. Mechin from the right side," which was the side of his body with damage. *Id.*

91.    Maucher opined that the case could settle for $4.5 million. *Id.* Maucher and Jeter engaged in an e-mail exchange regarding his report, leaving Kotcher, Wicker, Herman, Gagner, and others copied. Ex. 259; 1T.177:12-21.

92.    At this trial, Maucher testified that his clients, the Carquest entities, knew that they were discussed as a collective for purposes of

settlement allocations, and that none of them at this time asked him to differentiate one from another. 1T.177:22-178:13.

93.    On December 8, 2010, Hartford asked Maucher for (1) a summary of the strengths and weaknesses of the case for "Tasco, Voltec, and Carquest" and (2) his opinion as to whether liability should be split in thirds among them. Pl. Ex. 259 at 1.

94.    On December 13, 2010, Maucher provided Hartford with his responses. Maucher wrote:

> The reference to 33 1/3% I have mentioned numerous times related to my belief that for settlement purposes each of the 3 defendants should be prepared equally to see the case settle and it reflects the reality that all 3 defendants played a role in getting this product to Firestone, and that there is the possibility that a jury will lump the three defendants together w/o considering liability arguments and take the easy approach and split liability equally.
> . . .
> Anyone who can figure out what the jury will do is guessing at this point. However, all defendants have exposure and this is a case that should settle w/o leaving it to the jury who will place an enormous value on the case.

Pl. Ex. 7.

95.    On December 8, 2010, the Carquest principals, Maucher, and the non-Hartford insurers discussed Maucher's report. Pl. Ex. 85. The Carquest principals took issue with the one-third allocation the Carquest entities and any posturing to Plaintiff's attorney that the case was a "split liability situation." *Id.* Wicker expressed his hope that any settlement agreement could be structured in a way that the Carquest entities' portion could be contested for indemnification by Hartford, Voltec and TMC/Tasco. *Id.* During this exchange, the Carquest principals did not express that their respective entities should be distinguished in settlement or otherwise. Pl. Ex. 85.

96.    Because settlement was unsuccessful, Judge Salas had scheduled a mediation before Judge Dan Mecca for January 5, 2011. Pl. Ex. 259.

### 25.    Mediation

97. Discussing the upcoming mediation, the Carquest principals did not assert that their respective entities should be distinguished from each other in settlement or otherwise. Pl. Ex. 123; 1T.17-188:22.

98. The Carquest principals complained that Hartford was too optimistic about the case and that the case should be settled before it reached the "courthouse steps." Pl. Ex. 123.

99. In advance of mediation, Maucher submitted a confidential mediation memorandum to former Judge Mecca, in which he again referred to the Carquest entities as a collective. Pl. Ex. 246. In this trial, Maucher testified that it would be his practice to copy the Carquest principals on such a document. 1T.203:5-25.

100. On January 5, 2011, a mediation session was held before former Judge Mecca. Pl. Ex. 246.

101. After the mediation, Maucher reported to Hartford that the Plaintiff "would not take a penny less than $5 million" and that Mazie characterized this amount as a "gift" and a "discount." Pl. Ex. 145 at 2. Maucher also reported Mazie's comment that if plaintiff received favorable rulings on summary judgment, his demands would increase. *Id.* Maucher further reported that Mazie claimed to have done a focus group that returned a $15 million verdict, which Maucher did not find outlandish. *Id.*

102. Maucher forwarded the Hartford report to the Carquest principals and other insurers and, in the same e-mail, provided them with additional commentary. Pl. Ex. 145 at 1. Maucher noted that he had the sense the Hartford believed the case could be settled in the "$3+million range," which he disagreed with. *Id.* He considered how Hartford could raise the amount to $4.5 million. *Id.* He noted that, while $4.5 million is "a lot of money, if The Hartford is so sure of their position on indemnification and which policy is primary, they should lock in a settlement at their best number now before spending more money for three attorneys and before potential unfavorable rulings on 1/28/11." *Id.* Maucher also noted, "I certainly have not pulled any punches

with Hartford as to how I can see the potential for a huge jury verdict if we allow this case to get to trial." *Id.*

### 26. January 28, 2011 ruling on comparative negligence

103. On January 28, 2011, Judge Wigenton dismissed the defenses that were based on comparative negligence. Pl's Ex. 411. In this trial, Maucher testified that the ruling could have had some impact on his ability to put wrongdoing on Firestone. 1T.217:16-219:13.

104. After Judge Wigenton's ruling, Maucher reported to Hartford that all defense counsel agreed that barring the comparative negligence claim would have no impact on the case. Pl. Ex. 181. Maucher further reported that, while Judge Wigenton's ruling did not change the value of the case, "it certainly didn't lower the value of the case." *Id.* Forwarding the report to the Carquest principals, Maucher commented that "[t]this ruling makes me question the Judge's grasp of the case and her review of the motions." Pl. Ex. 181.

105. In his deposition for this trial, Kotcher commented that Judge Wigenton did not understand the difference between the Carquest entities or that they were not interchangeable. Kotcher Dep. at 159:5-160:6. Kotcher expressed that he understood that it was not in Mazie's interest to distinguish them, and he estimated that Judge Wigenton's understanding could be the result of the deposition testimony. *Id.*

106. In February 2011, Maucher, sent an e-mail copying Len Herman. Pl. Ex. 224. In the e-mail, Maucher noted that "there is great confusion among the witnesses and parties as to the Carquest/BWP relationship. Even some of the Carquest/CPI witnesses had a tough time explaining who they worked for and some worked for both entities." *Id.* Regardless of the confusion, Maucher noted that his motion on behalf of all three Carquest entities would be the same, in that they were all shielded by an innocent seller defense. *Id.*

107. Also in February 2011, Mulcahy reported on the performance of Voltec's warning expert in depositions. In Maucher's estimation, the expert "seemed to wilt under the pressure"; he wondered how she would handle a

trial; and he opined that she lacked the necessary expertise to testify that Firestone lacked safe work practices. Pl. Ex. 182.

### 27. Internal settlement discussions after Judge Wigenton's decision

108. During February 2011, Maucher forwarded information to Peerless and the other Carquest insurers regarding Hartford's intention to file a joint offer of judgment for $3.1 million (allocating 25% of liability to Voltec, 35% to TMC/Tasco, and 40% to the Carquest entitities). Pl. Ex. 182. *See also* Pl. Ex. 229.

109. Also during February 2011, Maucher and defense counsel discussed the allocation of the settlement. Pl. Ex. 124. Maucher disagreed with the 40% allocation. *Id.* Maucher emphasized that the Carquest entities "encourage all reasonable efforts by The Hartford to get this matter settled without resorting to trial as we believe a jury will give JM a BIG number based upon his injuries." *Id.* Maucher forwarded the e-mail exchange to the Carquest principals. *Id.*

110. During these settlement discussions, Hartford defended the 40% allocation as reasonable, citing the following reasons:

- "For the Offer of Judgment to have any effect, we have to tell the plaintiff what the allocation is. The idea is to put pressure on the plaintiff to get the case settled" Pl. Ex. 140.
- Maucher had recommended "a 1/3 split among the defendants" Pl. Ex. 140.
- The 40% figure was only "slightly higher" than Maucher's evaluation. Pl. Ex. 272.
- The "state of the record, review of the record, and the likely allocation of fault by a jury were the case to proceed to verdict, as well as the fact that plaintiff is critical of Carquest's marketing of this product," Pl. Ex. 272.
- Maucher's agreement that "Carquest" was "the target defendant in the case" Pl. Ex. 209.

- Maucher's statements that Carquest Corporation and CPI "have been used 'interchangeably' and interconnectedly, and a jury would likely see all three of these companies as 'one entity'" Pl. Ex. 209.

111. Hartford also stated in its correspondence that Hartford had been the only insurer defending and indemnifying the claim and that Hartford allowed the Carquest entities to have their own choice of counsel. Pl. Exs. 140, 209, 272.

112. Bob Wicker protested that the one-third allocation was only based on what a jury might do, but did not account for what could happen on appeal, the fact that Voltec did not advise that UL had not approved the light for commercial use, or the Carquest entities' own assessment that they owed zero liability. Pl. Ex. 272. Kotcher protested as well. *Id.*

113. Hartford sought clarification on the roles of each of the Carquest entities with respect to marketing and distribution of the product. Pl. Ex. 272, Kotcher and Wicker did not remember responding to that query. 2T.264.23-265:12; Wicker Dep. at 152:17-23; Kotcher Dep. at 328:2-336:24, 337:12-338:18.

114. In depositions, Kotcher testified that he did not "ever remember asking for individual allocation among the three Carquest entities. I don't think that was ever part of our discussion." *Id.* at 165:11-24.

115. During this trial, Maucher testified that his clients did not complain or protest about the fact that Hartford did not break out the offer among the Carquest entities. 1T.225:22-226:7.

116. On February 16, 2011, in an e-mail to the Carquest principals, Maucher answered, in response in Hartford's position, that he had "told Hartford and anyone else involved in this case that I do believe a jury at the end of a 5-6 week trial will have trouble differentiating among the roles of Carquest Corporation, CPI, and BWP." Pl. Ex. 209. In that email, Maucher also stated that mutual finger-pointing at trial would likely result in an even allocation among the Carquest entities:

did express the possibility that a jury would assess liability equally most likely, especially if (when) the gloves come off and the finger-pointing begins among the defendants. In a complex case where all 3 defendant groups believe they did nothing wrong, an equal sharing of liability is not unlikely.

Pl. Ex. 209.

117.  During depositions in this case, Kotcher testified that the 40% allocation to the Carquest entities "seemed absolutely ludicrous to us, because we had [already] objected strenuously to the one-third, one-third, one-third." Kotcher Dep. at 164:12-165:9.

118.  Maucher relayed the protests of the other insurers to Hartford. Pl. Ex. 147.

119.  On February 22, 2011, Maucher wrote to the Carquest entities and the other insureds seeking consent and authority to sign the Offer of Judgment. Pl. Ex. 126. Maucher noted that, because the Carquest entities had formalized their objection to the liability split, he did not believe that the Carquest entities or their carriers would be committed to the 40% allocation. *Id.* That same day, Peerless gave Maucher permission to sign the Offer of Judgment. Pl. Ex. 148. Peerless did not ask Maucher to seek a separate sub-allocation or percentage for Carquest Corporation alone. 1T.244:3-16; 3T.632:11-14. On March 7, 2011, counsel for Zurich and UUIC, the insurers for CPI and BWP, wrote to demand separate allocation for CPI and BWP. Pl. Ex. 268. Maucher forwarded the demand letter to the Carquest principals, adding "I naturally have questions as to who is controlling settlement negotiations in this matter. At the end of the day I represent your companies and will be guided by what you instruct me to do." *Id.* During this trial, Maucher testified that the Carquest entities did not agree with Zurich and UUIC's demand to further break out the offer of judgment. 1T.247:5-9.

120.  Kotcher wrote to the UUIC adjuster that, "[s]ince UUIC has not joined in CPI's defense and since Hartford continues to defend and indemnify CPI, we do not believe UUIC can assert that Mr. Maucher must have UUIC's

'authority' to agree to a reasonable settlement that Hartford has committed to fund." Pl. Ex. 271.

121. On March 11, Maucher, at Wicker's request, sent the Carquest entities his analysis of their exposure under the New Jersey Product Liability Act. Pl. Ex. 225. Maucher's analysis did not distinguish between the entities. *Id.* At this trial, Maucher testified that, after Wicker received the analysis, Wicker never requested that Maucher discuss the specific roles. 2T.267:11-18.

### 28.   The Carquest entities' motion for summary judgment

122. On March 16, 2011, Maucher filed a motion for summary judgment on the Carquest entities' behalf, arguing that: (1) the Carquest entities were innocent sellers; (2) the Trouble Light was not defective; (3) plaintiff could not prove proximate cause; (4) the Carquest entities did not participate in the design of the Trouble Light; (5) the Carquest entities did not have a role in creating or placing the warnings on the Trouble light; and (6) at minimum, BWP and CPI should be dismissed. Pl. Ex. 127.

123. In this trial, Maucher testified that there is a good chance he sent a draft of the summary judgment motion to the counsel for the Carquest entities, but he could not recall. 2T.272:5-16.

124. On March 16, 2011, Mechin also moved for summary judgment, arguing summary judgment should be granted in Mechin's favor on the issues of defective design, the warning defect, and proximate cause. Pl. Ex. 413. In his brief in support of summary judgment, Mechin cited to Ginsburg's testimony, stating that Carquest's Director of Advertising explained "that they produced an advertising flier which was directed to professional users and contained the Carquest Trouble Light." *Id.* at 10. Mechin also cited to testimony from the employees of the Carquest entities, stating that the Trouble Light was intended for and represented as being appropriate for use in commercial garages. *Id.* at 10–11.

125. When the case did finally settle on May 24, 2011, both sides' summary judgment motions were pending. 2T.346:23-347:6.

### 29.    March 2010 e-mails between Maucher and Jones

126.   On March 16, 2011, Donna Jones, an adjuster for Peerless, e-mailed Maucher without copying Hartford. Pl. Ex. 151. Jones noted that the summary judgment motion sought separate dismissal for CPI and BWP because they were without fault and there was no evidence of negligence. *Id.* Jones objected that, by implication, Maucher's motion was suggesting that Carquest Corporation was negligent. *Id.* Jones asked why Maucher had not sought such dismissal for Carquest Corporation. *Id.*

127.   Maucher responded to Jones, essentially asserting that he had asserted Carquest Corporation's strongest defense, *i.e.,* the innocent seller argument: "no way Carquest Corp. gets out unless my first argument that we are innocent sellers carries the day. I can make a thin argument that CPI was a warehouse-type defendant and BWP truly just a retail store, but no such argument can be made as to Carquest Corp. It is a fallback argument in the hope that the Court will at least let out some defendants." *Id.*

128.   Jones also asked Maucher to provide the basis for his view "that there is no way to extricate Carquest Corporation. . . . My understanding is that Carquest Corp. did nothing more than license the Carquest name to CPI." *Id.* Maucher responded that, whether or not that was true, he was stuck with the testimony of the witnesses who had referred to "Carquest" as the "manufacturer (yes, believe it or not), advertising, marketing, etc. Plus, some witnesses worked interchangeably for Carquest Corp. and CPI and used those companies interchangeably." *Id.* Maucher reiterated his strategic position that the best argument was that all three were innocent sellers. *Id.*

### 30.    Jones speaks to Kotcher about new counsel

129.   At some point after reading Maucher's summary judgment brief, Jones suggested to Kotcher that they obtain new counsel. 3T. Jones testified that she "was tired of all the entities being lumped together, and [she] felt like [Maucher] was not making the proper arguments for Carquest Corporation."

130. Jones testified that Kotcher responded to her suggestion by stating that he would "roundtable it." Jones also testified that Kotcher did not like the summary judgment motion either, but he got back to her and said that "they" had determined to keep Maucher.

131. Jones did not tell Hartford about her request to replace Maucher as counsel. 3T.686.6-14.

### 31. Q&A after Mechin's counsel asserts Fed. R. Civ. P. 11

132. On March 18, 2011, Mazie sent Maucher an e-mail, flagging it as high importance. Pl. Ex. 415, 416. Maucher forwarded the e-mail to the Carquest entities and their insurers, informing them that Mazie had invoked Fed. R. Civ. P. 11, asserting that the innocent seller argument was frivolous. Pl. Ex. 415. Maucher forwarded the e-mail to the Carquest principals and Hartford. *Id.*

133. Jeter, on behalf of Hartford, responded with several follow-up questions. *Id.* In answering those questions, Maucher opined as follows:

- The chance of getting all of the Carquest entities out of the suit on summary judgment was at "almost zero" because Mazie raised the issue that the actual Chinese manufacturer was not in the case;

- The chances of winning partial dismissal as to the design, manufacturing, testing and warning claims removed was "Average to Good 'IF' the Judge takes the time and energy to address specific secondary requests for SJ"; and

- The chance of winning dismissal as to BWP and CPI was 0-5% "because there are simply too many issues of material fact in dispute. Mazie's SJ brief lays out what CPI allegedly did or did not do, and throws enough at BWP to keep every defendant in the case."

Pl. Ex. 415.

### 32. Jones sends Maucher an internal memorandum regarding his argument to separately dismiss BWP and CPI

134. On March 25, 2011, Jones sent Maucher an "internal memorandum" regarding Maucher's alternative argument to separately dismiss

BWP and CPI. Pl. Ex. 153. There, Jones asserted that by moving on behalf of the other two entities, Maucher's motion was implying that Carquest Corporation was most culpable. *Id.* Jones asserted that the BWP/CPI alternative argument was prejudicial to Carquest Corporation and unsupported by the record. *Id.* In support, Jones cited the deposition testimony of Dan Lewis, Richard Egan, Jay King, Scott Ginsburg, Richard Pallai, and Gaic Manno. *Id.* Jones asserted that Carquest Corporation was not the manufacturer nor in the chain of distribution; rather, it granted CPI a license to use the "Carquest" name. *Id.* Jones further contended that, even if Carquest Corporation were a seller under the definition in the New Jersey Liability Act, its role was minor when compared to that of BWP and CPI. *Id.* Jones summarized that "[i]t appears that, in a creative but legal manner, Carquest Corporation has attempted to insulate itself from liability on product liability claims. Unless Ohio Casualty is missing something, it would seem that you should be taking full advantage of Carquest Corporation's efforts and aggressively seeking to extricate the company from the Mechin action." *Id.* p. 5.

135. Jones also questioned why the manufacturer, TMC-China, had not been joined in the action. Pl. Ex. 153. Jones then made several objections to facts asserted in Mechin's summary judgment motion. *Id.*

136. Concluding the memo, Jones asked Maucher for "a detailed analysis of the evidence that tends to inculpate Carquest Corporation." *Id.* p. 6. If no such evidence was "forthcoming," Jones asserted that Maucher should, at minimum, include a "corrective statement" in his summary judgment reply submission and act aggressively to force Mechin to "articulate a viable theory of liability against Carquest Corporation." *Id.* Jones did not share the memorandum with Hartford. 3T.677:3-24; Jeter Dep. at 135:10-136:3.

137. In this trial, Maucher testified that he did not agree that his alternative argument to dismiss CPI/BWP was prejudicial to Carquest Corporation. 2T.292:3-8. Further, Maucher testified, he did not submit a "correction" statement because he thought that Ohio Casualty's (*i.e.,* Jones's)

position was not supported by all facts in the record. 2T.293:24-294:24. In reaction to the deposition testimony that Jones used to support her position, Maucher commented, "it's easy to cherry-pick certain lines out of the deposition to support a position." 2T.500:17-501:12. The motion, however, was to be decided on a summary judgment standard. .

### 33. Voltec's settlement

138. On April 18, 2011, Voltec settled for $900,000, paid from the Hartford Voltec policy. Pl. Ex. 141.

139. That day, Maucher e-mailed the Carquest principals and insurers to inform them that he had reached out to Mazie regarding settlement. Pl. Ex. 237. Maucher reported that Mazie was demanding a total of $5 million (leaving a balance of $4.1 million after Voltec's settlement), and that Mazie did not care who the money came from. *Id.* Maucher also reported that Mazie mentioned settling with TMC/Tasco and then taking the Carquest entities to trial because he thought "that would be an easy case with a potentially huge upside." Maucher expressed some skepticism, believing that such a strategy might expose Mazie to too much risk. *Id.*

140. In response to Maucher's e-mail, Jeter advised that Mazie had approached Voltec's defense counsel regarding settlement. Pl. Ex. 237. Jeter also noted that despite the settlement, Voltec was not entirely out of the picture, "because we still have the cross-claim against Voltec for indemnification." *Id.* Jeter doubted that the indemnification clause would require Voltec to "indemnify Carquest for Carquest's marketing practices," but asked Maucher for his opinion on the viability of the indemnification claim. *Id.* The indemnification clause, Jeter noted, states that Voltec, for certain liabilities, would indemnify not only Carquest Corporation, but also each member. *Id.* Seeking information on the term "each member," Jeter noted, "[i]n the past, I've asked about how the Carquest entities related to each other, and I am still in the dark." *Id.*

141.  Jeter advised that Hartford, after paying the $900,000 to settle on behalf of Voltec, would still have $1.1 million remaining on Voltec's primary policy. *Id.* Jeter also advised that Hartford's excess policy would not be triggered until after the Carquest defendants had exhausted their primary policy. This statement dovetailed with Hartford's position that Voltec did not agree to "indemnify Carquest for Carquest's independent negligence; e.g., their marketing practices." *Id.*

142.  On April 20, 2011, Maucher advised the Carquest principals and some Carquest insurers, not including Hartford, on the status of the case. Pl. Ex. 155. Maucher predicted that Voltec would not be present at trial, "guarantee[ing] that plaintiff will minimize any arguments against Voltec and focus on the Carquest defendants and TMC." *Id.* Maucher also reported that Mazie believed he had an easy case against the Carquest defendants based on marketing and the expert opinions. *Id.*

143.  On April 21, 2011, Len Herman sent all Carquest insurers but Hartford an e-mail with a document titled "MECHIN V CARQUEST settlement framework." Pl. Ex. 128. Plaintiff's Exhibit 128 does not include the document attached to the e-mail. *Id.*

144.  On April 27, 2011, Kotcher e-mailed Zurich and Ohio Casualty (Peerless) seeking consent for the Carquest entities to make a settlement offer of $2.1 million, and an agreement that both Zurich and Ohio Casualty would each commit up to $362,177 on behalf of Carquest Corporation and CPI. Pl. Ex. 189. Kotcher explained that he assumed that the remaining $4.1 million would be split so that the Carquest entities would pay 53.3% of the settlement and TMC/Tasco would pay 46.67% of the settlement. *Id.* Kotcher also presumed that Hartford would provide the Carquest entities with the remaining $1.1 million from the Voltec policy. BWP, Kotcher noted, was making a similar demand of its carrier. *Id.*

145.  Jones, of Peerless, agreed to provide an equal share of the settlement. 3T.691:4-7.

### 34.  Final settlement conference on May 24, 2011

146.  On May 24, 2011, the parties met for a settlement conference. Pl. Ex. 492; 2T.346:10-20. Maucher submitted a settlement memorandum, which did not distinguish among the Carquest entities. Pl. Ex. 492. Prior to the conference, Hartford agreed to "front its full remaining policy limit of $1.1M in an effort to resolve this case for the Carquest entities." Pl. Ex. 161.

147.  During this trial, Jones testified that, at the start of the settlement conference, Mazie belabored his point about the marketing of the Trouble Light. 3T.698:15-699:18.

148.  The case settled on May 24, 2011. Pl. Ex. 162, 394. Hartford contributed $1.1 million; the insurers for the Carquest entities each paid $316,666.67; and TMC/Tasco paid $1.75 million. Pl. Ex. 162, 394; 3T.697:8-698:7.

149.  Kotcher and Wicker both suggested to Maucher that one person, Neil Stockel, could sign for all three Carquest entities. Pl. Ex. 191. Herman decided against it, noting that "no one ever believes that we are separate companies . . ." *Id.*

### 35.  Remaining indemnification claim

150.  One month before the Mechin settlement, Maucher advised his clients that a motion for indemnification should wait until after trial or settlement because "the need to indemnify does not arise until there is a finding of liability on a party." Pl. Ex. 155.

151.  On June 13, 2011, Jones wrote to Jeter, copying Maucher. Pl. Ex. 192. Jones asserted that if Maucher were unprepared to make arguments favoring Carquest Corporation on summary judgment, then Jones would request separate counsel. *Id.* Jones attached her March 25, 2011 memorandum. *Id.*

152.  In response, Jeter declined the invitation to fire Maucher. Pl. Ex. 164. Jeter stated:

> As was noted in March, the allocation among the Carquest entities . . . belongs in the declaratory judgment action; and, although

Hartford has committed to and is paying for the defense of the Carquest entities on the claims of the plaintiff and the cross-claims of the other defendants, we see no reason why we should replace the defense lawyer who has handled the case thus far merely because you think it may reduce Ohio Casualty's coverage exposure. Obviously it was not necessary for the relative fault and/or exposure of the Carquest entities to be decided before settlement or trial. Neither Mr. Maucher nor the Carquest entities' principals ever suggested that it be done. . . . [W]ell before the settlement, Hartford repeatedly requested input on the issue of relative responsibility from the Carquest entities. No reply was received. Hartford did not insist on an answer because it was our belief (and we assume the view was shared by the Carquest principals and Mr. Maucher) that litigating that issue during the case would have, at best, confused the case and, at worst, effectively placed the Carquest defendants in a "circular firing squad" - much to the delight of plaintiff's counsel. . . . Had [Maucher] been as sure as you seem to be that Carquest Corp. had little or no exposure or was entitled to summary judgment, he could have recommended a smaller share for Carquest Corp., or requested permission to file a motion seeking dismissal of all claims against Carquest Corp.

153. In a follow-up e-mail, Jeter also stated that "[t]o fire Mr. Maucher now and retain new, separate counsel would risk confusing and infuriating the court and could seriously prejudice all of the Carquest defendants." Pl. Ex. 165. Kotcher also disagreed with Jones and decided to "keep a unified front" with respect to the upcoming motion for summary judgment. Pl's Ex. 166. Kotcher Dep. at 244:19-246:141; 3T.724:15-726:16, 725:24-726:3.

154. Kotcher requested that Maucher share with Jones and the Peerless coverage counsel, John Coyne, all drafts for comments and suggestions. Pl. Ex. 166.

155. Jones and Coyne provided Maucher with detailed suggestions and criticisms of his draft brief on the indemnity claim. Pl's Exs. 233, 169, 234, 396, 342.

156. Coyne suggested that Maucher should argue that the joint representation of the Carquest entities had prejudiced them. Pl. Ex. 337. Maucher inserted the point into his draft brief, which Hartford disagreed with. Pl. Exs. 36, 171. Hartford asserted that if Maucher argued that his joint

representation would be prejudicial, then should need to resign. Pl. Ex. 36. Maucher removed the point from his draft, and asserted that he did not believe that he had "done anything less than my best efforts to defend all of my clients." Pl. Ex. 291. At this trial, Maucher testified that at no point in the Mechin action did he believe that he was prejudicing his clients. 2T.397:6-11.

    .   157. It was Maucher's opinion that additional parol evidence regarding the Voltec contract would not be helpful to the defense. 1T.139:4-7.

    158. On February 28, 2012, Judge Wigenton denied the Carquest entities' motion for summary judgment, holding that the language in "Carquest's" contract with Voltec was ambiguous and unenforceable. Pl. Ex. 431. Voltec had moved to dismiss Carquest's claims, which Judge Wigenton granted. *Id.*

    159. That same day, Maucher reported to Hartford: "I would not recommend an appeal on this claim . . . as the likelihood of the decision being overturned are minimal." Pl. Ex. 293.

    160. Hartford notified all parties that it was withdrawing its defense for the Carquest entities. Pl. Ex. 8.

### 36. Indemnification

    While both parties have submitted a number of facts related to indemnification, I find the following to be material and essential:

    161. Regarding tender and indemnification, Maucher testified that the issue "didn't matter to me, but I was under the impression the acceptance was already a done deal, that was already decided by the time it came to my office." 1T.97:20-98:3. Further, he testified that whether Hartford paid his bills because of contractual indemnity or vendor endorsement as an additional insured did not matter to the way he handled the case. 1T.98:3-19.

    162. In the summer and fall of 2010, Hartford began searching for the policies of the defendants' other insurers. 1T.118:11-24; Pl. Ex. 73, 81, 87.

    163. In November 2010, Hartford obtained the other insurers' policies. Pl. Exs. 81, 87. After reviewing the policies, Hartford concluded that its Voltec policy was excess, and notified Gagner at Peerless. Pl. Exs. 87–89.

164.  On November 22, 2010, the Hartford Voltec adjustor, Jacques Georges, wrote to Peerless:

> As a preliminary matter, please note that Hartford is not "reneging" or withdrawing from the defense of the CARQUEST entities. Further. Hartford has no intention to assert or otherwise limit Hartford's indemnity obligations to the CARQUEST entities they remain the same, subject to the terms, conditions, and limitations set forth within the Hartford policy. Hartford has and will continue to defend the CARQUEST entities in the utmost good faith. Any insinuation that Hartford has not been or is not acting in good faith with respect to its defense of the CARQUEST entities is entirely groundless.

Pl. Ex. 81. Jones, the Peerless claims adjuster, understood that Hartford did not demand that Peerless or any other insurer undertake the remainder of the Carquest entities' defense. 3T.591:10-12, 593:1-8, 601:23-602:1.

165.  On December 2, 2010, Hartford filed the declaratory judgment action now before me on a docket separate from the underlying Mechin case. (DE 1).

166.  Peerless has put forth evidence that the Carquest entities and their defense counsel had understood that Hartford had conceded the applicability of the indemnity clause. T4.938:9-939:9; 2T.464:12-18. Peerless also points to internal communications at Hartford that indicates that some Hartford employees understood that Hartford took on the defense subject to Voltec's indemnification agreement. Def's Exs. 44 (E-mail from Giarrizzo of Hartford, dated Sept. 1, 2009, stating "The Hartford has taken over the defense of co-defendants Carquest & BPW [sic] based on Voltec's contractual obligations to them."), 98 (Jeter to DeMerchant e-mail, dated July 26, 2010, "Don't forget that Voltec has the duty to indemnify."); 77 (Apr. 28, 2010, Large Loss Report prepared by Scherer of Hartford, "Carquest Products, Inc./BWP Distributors, Inc. had previously demanded contractual defense and indemnification from Voltech [sic] Industries. That tender was accepted and Carquest Products, Inc./BWP Distributors, Inc. is currently being defended under the Voltech [sic] Industries policy.").

## II.    CONCLUSIONS OF LAW

I start with the following general comments on testimony, propositions and principles.

First, I found Maucher's testimony, which was corroborated by contemporaneous documents, to be highly credible in general, and in the following respects in particular: (a) his belief that a jury might well regard the Voltec entities as an integrated whole with respect to the product; (b) his belief that a jury verdict might well have totaled two or three times the settlement amount; (c) his good faith strategic judgment that a united front was the best approach; (d) his primary loyalty to the overall good of his clients. In my judgment, Maucher did not shade the truth or attempt to deflect criticism of his representation. I accept that the Carquest entities themselves, despite inquiries, failed to clarify the distinctions among themselves that one insurance carrier now urges upon the court. Faced by contradictory testimony, Maucher made a reasonable decision that summary judgment for Carquest was not in the cards, and that the risk of going to trial to preserve that issue was too great.

The testimony of Donna Jones is emblematic of the evidence to which I gave less weight. I do not mean to imply that Ms. Jones failed to testify to the truth as she saw it. Still, I believe that her judgments about the conduct of the lawsuit were infected by hindsight, even at the time. Her testimony did not, in my view, sufficiently take into account the strategic choices that faced counsel in real time, the uncertainty of the result, and the risk that testing certain contentions in court might result in a large judgment that would have disadvantaged all of the Carquest entities and their carriers. Her belated intervention and insistence on a separate summary judgment motion for Carquest Corporation, in my view, had little potential to change the result, and would not have been a reasonable basis to forgo an advantageous settlement. Her demand that Maucher be replaced was overruled.

Second, I have largely passed over in silence the many objections lodged to various pieces of testimony or evidence. Objections based on relevance are

obviously rejected as to evidence that is cited; I cited it because I found it relevant. Certain of the objections (that one statement or another contained opinion, for example), would be more relevant if this were a jury trial; the Court, however, is capable of sorting out opinion from fact. Moreover, many matters of "opinion" are independently relevant as contemporaneous strategic considerations of counsel in connection with the conduct of the defense of the Mechin case.

In these conclusions of law, I start with Peerless's estoppel arguments. Next, I consider Peerless's contentions that Hartford's claims must be dismissed because Hartford failed to call an expert witness. I then consider whether Hartford secured a reasonable, good faith settlement, and whether Carquest Corporation was reasonably allocated a one-third share of the responsibility for it. Finally, I consider Peerless's remaining claims against Hartford for breach of contract, breach of fiduciary duty, and (possibly) negligence.

### 1. Estoppel

Peerless makes two main arguments for estoppel: one based on Hartford's handling of Carquest Corporation's indemnification claim, and the other under the *Eggleston* rule, based on Hartford's having taken on responsibility to conduct the defense. (DE 264). While I have already dispensed with these estoppel arguments on summary judgment, (DE 200 at 11–14), I did not bar the parties from introducing evidence relevant to them (which would have been difficult to segregate in any event). With the benefit of a trial record, I briefly revisit Peerless's *Eggleston* argument that control of the defense may give rise to an obligation to pay the judgment. *See Merchants Indem. Corp. v. Eggleston*, 37 N.J. 114, 127–29 (1992) (DE 264 at 54). Essentially, Peerless argues that because Hartford was the first insurer to grab the check, it must now pay the whole tab. (DE 264 at 50–54). For what it is worth, the Carquest entities themselves (as opposed to their carriers) supported the joint defense strategy and actively participated in it. To avoid doubt, with the benefit of a full

42

trial record I again reject Peerless's *Eggleston* argument, and incorporate here the legal discussion from my summary judgment opinion. (DE 200)[11]

### i. Estoppel based on handling of indemnification claim

Peerless argues that Hartford is estopped from recovering contribution because Hartford initially assigned Voltec and the Carquest entities to the same defense counsel, Mulcahy. Peerless also faults Mulcahy for failing to pursue parol evidence regarding the interpretation of the indemnity provision.

This is in essence an attempt by Peerless to relitigate Carquest Corporation's indemnification claim against Voltec, which was rejected on summary judgment in the Mechin action. Under the doctrine of *res judicata*, "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit." *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 313 (3d Cir. 1995) (internal citations omitted). Courts have previously held that an insurer is privity with its insured, and therefore may not relitigate claims lost in a prior action between its insured and the defendant. *See e.g., Hartford Ins. Co. of the Midwest v. Caver*, No. A-5747-14T3, 2016 WL 6502683, at *2-*3 (N.J. Super. Ct. App. Div. Nov. 3, 2016). Here, Peerless's insured, Carquest Corporation, fully and fairly litigated the indemnification issue in the Mechin action. Judge Wigenton found the indemnification provision ambiguous, and therefore ineffective as a matter of law, on summary judgment. (*See* Judge Wigenton's February 2012 Opinion, Pl. Ex. 431).

For avoidance of doubt, however, I will state plainly that I here incorporate Judge Wigenton's analysis. The Voltec indemnification agreement is, on its face, ambiguous and therefore unenforceable. (DE 200 at 14–15 n.13 (citing *Englert v. Home Depot*, 389 N.J. Super 44, 58 (App. Div. 2006) ("Under prevailing law, an ambiguous contractual indemnification provision must be

---

[11]     The remainder of Peerless's arguments regarding the joint defense strategy will be applied to Peerless's argument that Hartford did not meet its defense obligation.

construed against the indemnitee."); *Henthome v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 758 (Md. Ct. App. 200) ("Such clauses indemnifying the indemnitee for the indemnitees own negligence are strictly construed and will not be held to provide indemnification unless stated in clear and unequivocal terms. . . . The indemnity clause here did not unambiguously express that [indemnitor] would defend and indemnify [indemnitee] for [indemnitee]'s own negligence. Without such an explicit provision, [indemnitor] is not responsible for costs and defenses and indemnification resulting from [indemnitee]'s own negligence.") (internal citations omitted)); Pl. Ex. 431). On summary judgment, I adopted the judgment of Judge Wigenton:

> Peerless's argument suffers from an intractable problem: as a matter of law, the indemnity provision of the Voltec Agreement is invalid because it fails to state in "clear and unequivocal" terms that Voltec must indemnify the Carquest Entities for their own negligence. *See, e.g., Norkus v. Gen. Motors Coip.*, 218 F. Supp. 398, 399 (S.D. Md. 1963); *Mantilla v. NC Mall Assocs.*, 167 N.J. 262, 269-273 (2001). Simply put, any "implied concession" concerning the Voltec Agreement is irrelevant because Carquest could not (and cannot) enforce the indemnity provision against Voltec.

(DE 200 p. 14).[12] Thus, it makes little if any difference that Voltec and the Carquest entities were assigned the same defense counsel for the first year of the case, before representation was split.[13]

Peerless argues in the alternative that, even if the indemnity clause would have been enforceable, estoppel is still proper. Here, Peerless relies

---

[12]     Moreover, I consider that "[a]n insurer's duties are defined by what *it* contracted to do, not by what the *insured* contracted to do." *Jeffrey M. Brown Assocs., Inc. v. Interstate Fire & Cas. Co.*, 414 N.J. Super. 160, 172, 997 A.2d 1072, 1079 (App. Div. 2010) (emphasis in original) (citing 2 Allan D. Windt, Insurance Claims & Disputes: Interpretation of Important Policy Provisions § 11.30 at 11–469 (5th ed. 2007)). Here, Voltec, not Hartford, was a party to the alleged indemnity agreement at issue.

[13]     The Carquest entities were given their own counsel in April 2010, well before fact discovery ended in September 2010. *Mechin v. Carquest Corp.*, 07-cv-5824, DE 219. If at that point, or even after, the Carquest entities and their counsel wished to pursue discovery regarding the indemnification claim, they could have done so without the impediment, if any, of Voltec's interests. The Carquest entities were then represented by counsel who answered to them as clients.

primarily on *Arch Ins. Co. v. Nationwide Property & Casualty Ins. Co.*, Index No. 6542835/2014, (N.Y. Supr. Ct., N.Y. Cty., Dec. 12, 2012), an unpublished opinion of the Supreme Court, New York County. That court ruled that because an insurer defended and indemnified two tendering defendants as if they were additional insureds, those tendering defendants were entitled to rely on the full coverage available to them as additional insureds. (Transcript at 5:18-26, *Arch Ins. Co. v. Nationwide Property & Casualty Ins. Co.*, *supra*.) There are two dispositive distinctions between *Arch Insurance* and this case. First, in *Arch Insurance*, the underlying indemnification provision had not been previously ruled unenforceable. Second, in *Arch Insurance*, the additional insured coverage provided for both primary and excess insurance; here, however, only the excess policy provided coverage to the Carquest entities as additional insureds, weakening any claim of reliance. Thus, I am not persuaded that *Arch Insurance*, even if it were binding, would change the result here.

### 2. Peerless's motion to dismiss Hartford's claims for failure to provide an expert

Peerless moves to dismiss Hartford's claims because Hartford failed to provide expert testimony as to the reasonableness of the underlying settlement for $2,050,000 and its one-third allocation to Carquest Corporation. (DE 264, pp. 41-44); T5.1114:19-1123:5.

For the proposition that expert testimony was required, Peerless relies on two state court cases. (DE 264 at 41 (citing *Kapuscenski v. Hess Corp.*, No. A-2202-12T3, 2014 WL 1125055, at *6 (N.J. Super. Ct. App. Div. Mar. 24, 2014) ("We noted that an expert in the settlement of claims, such as an experienced torts attorney or claims adjuster, was necessary to explain the various factors that are taken into consideration when a case is settled."); *Pasha v. Rosemount Mem'l Park, Inc.*, 781 A.2d 1119 (App. Div. 2001)). In both *Kapuscenski* and *Pasha*, the state appellate court noted that an expert was necessary to determine the reasonableness of a settlement because "the many factors that go into a settlement are not within the knowledge of the average juror."

*Kapuscenski*, 2014 WL 1125055 at *6 (N.J. Super. Ct. App. Div. Mar. 24, 2014) (citing *Kelly v. Berlin*, 692 A.2d 552, 558 (App. Div. 1997); *Pasha*, 781 A.2d at 1124 (citing *Kelly*, 692 A.2d at 558)).

The reasoning of those cases has far less force here. This was not a jury trial, but a bench trial. Unlike a jury, I am not presumed to lack knowledge of the governing substantive and procedural law or the factors that go into a reasonable settlement. I am able to consider and evaluate the parties' arguments as to the reasonableness of the decision to settle this claim, which was litigated in this very district before a judge of coordinate jurisdiction. While perhaps an expert might have been helpful, the absence of an expert does not doom the claims as a matter of law, as Peerless would have it.

### 3. Reasonable and good faith settlement

When an insurer wrongfully refuses coverage and defense to its insured, "so that the insured is obliged to defend himself in an action later held to be covered by the policy, the insurer is liable for the amount of the judgment obtained against the insured or of the settlement made by him. " *Griggs v. Bertram*, 88 N.J. 347, 364 (1982). That liability extends to situations in which an insurer declines to provide coverage or defense to its insured, leaving it to some other insurer to provide coverage and defense. *Hartford Cas. Ins. Co. v. Peerless Ins. Co.*, No. 10-6235 (KM)(MAH), 2016 WL 5723659, at *7 (D.N.J. Sept. 30, 2016). The only limitation on the insurer's required contribution is that the settlement must be both reasonable and in good faith. *Griggs*, 88 N.J. at 364. The insured, or, in this case, the defending insurer, bears "the initial burden of producing 'the basic facts relating to the settlement' which demonstrate 'the operative evidential facts as to its reasonableness and good faith . . .'" *Burlington Ins. Co. v. Northland Ins. Co.*, 766 F. Supp. 2d 515, 528 (D.N.J. 2011) (citing *Griggs*, 88 N.J. at 367). That means that "[t]he insured must show that the settlement is 'by the initial production of proof to be prima facie reasonable in amount and untainted by bad faith . . .'" *Id.* (citing *Griggs*, 88 N.J. at 367). "[R]easonableness and good faith require that the

insured expend efforts to determine whether the claims are valid and whether the amount proposed is reflective of the injuries claimed." *Excelsior Ins. Co. v. Pennsbury Pain Ctr.*, 975 F. Supp. 342, 357 (D.N.J. 1996). "The *Griggs* standard does not call for 100% accuracy, but only that in light of all of the relevant facts and upon a reasonable inquiry, the insured agreed to a settlement amount that was reasonable and entered into in good faith." *Id.*

Once the insured or its insurer has made its prima facie case, the burden shifts to (in this case) the other insurer, who is "required to sustain the ultimate and major burden of demonstrating, by a preponderance of the evidence, that it is not liable because the settlement is neither reasonable nor reached in good faith." *Griggs*, 88 N.J. at 367. That burden is a heavy one. *Burlington*, 766 F. Supp. 2d at 530.

Hartford argues that the $2,050,000 settlement figure paid by the Carquest entities to settle the Mechin action was arrived at in good faith. I agree. No evidence presented to me demonstrates that Maucher negotiated for this settlement with anything in mind other than his clients' best interests. He pushed against not only Mechin's counsel but also against Hartford to lower the settlement amount for the insureds. Maucher settled at a price and an allocation amount based on the united-front strategy he had pursued in consultation with the Carquest entities. Further, Maucher testified that he put his clients' joint interests before Hartford's, and I found that testimony credible and persuasive. Even for the period before Voltec obtained separate counsel, I see no particular indication that Hartford's control of the defense of Voltec made any difference to Maucher. Maucher routinely communicated separately with his clients and the other insureds, and, at one point, even pursued the Voltec indemnification claim.

Hartford next argues that the settlement was reasonable. An overall $2,050,000 settlement on behalf of all three Carquest entities certainly appears reasonable under these circumstances. Consider the situation of the Carquest entities: (1) Estimates of a jury verdict exceeded $15 million; (2) the plaintiff

was a young man, seriously injured and left with permanent scarring; (3) depositions left evidence (conflicting, to be sure) that all three entities were potentially liable; (4) the court had eliminated the Carquest entities' primary, innocent seller defense; (5) the defendants' expert was not predicted to testify well; and (6) plaintiff's experts placed significant blame on the Carquest entities.

Under those circumstances, I cannot fault the reasonableness of the $2,050,000 settlement.

Peerless has a more focused argument, however. It argues that, even if the overall amount was reasonable, Carquest Corporation in particular should not have had to contribute, because it did not participate in the marketing or advertising of the trouble light. The reasonableness of the settlement and its allocation, however, is not based solely on whether Carquest Corporation *might* ultimately have succeeded in shifting liability to its sister corporations. Rather, it is a question of whether Maucher made a reasonable judgment that Carquest Corporation was at a significant risk to lose.

To test Carquest Corporation's position in court, the price of admission was exposure to a much larger total damages award. In the Mechin action, the plaintiff pursued a strategy that assumed a jury might not much care what role Carquest Corporation actually played in the marketing and distribution of the Trouble Light. Maucher considered Mechin's strategy to be a viable one. Maucher believed that the jury would see Carquest Corporation as the head of a unitary enterprise, consisting conglomerate of interrelated companies, that placed its name on a product without adequately checking the product's safety. Carquest Corporation had permitted the light to be marketed by the other two entities under the Carquest name. The ownership of the three entities was intermingled.

I find Maucher's assessment to be reasonable, particularly given the contradictory record created during depositions in the summer of 2010. Witnesses, from both within and outside of the Carquest entities, placed Carquest Corporation into the process of marketing and distributing the

Trouble Light. Further, the depositions suggested that the distinctions between the entities were unclear and unimportant even to their own employees. For that additional reason, it was reasonable for Maucher to determine that a jury would find these entities indistinguishable.

I have reviewed that muddled record. I conclude as a matter of law that, at the point of settlement, Carquest Corporation had little chance of avoiding trial on this issue *via* summary judgment.

If the case went to trial, the Carquest entities would face a jury, emotionally potent facts, and a plaintiffs' counsel who was intent on holding all three Carquest entities liable. Maucher, quite reasonably, predicted that there was a strong possibility of a high dollar award.

Nor did Maucher keep his opinion to himself. He repeatedly reported to the Carquest entities and their insurers that Carquest Corporation was going to take on the brunt of Mechin's case. No one expressed any timely disagreement.

I also note that, when Peerless itself controlled Carquest Corporation's defense, it did not make any effort of its own to extricate its insured from the case. Eventually, Peerless handed off the defense to Hartford. Peerless did not mention Carquest Corporation's "iron clad" defense until the infighting started. I find that Maucher made a reasonable judgment that the settlement, and Carquest's acceptance of a one-third share of it, was worth it because it averted the danger of something far worse.

For all of those reasons, I do not find that Peerless has demonstrated that Hartford's settlement, viewed from the perspective of the time it occurred, was anything but a good faith and reasonable one.

Peerless argues in the alternative that, assuming Carquest Corporation is allocated a share of the liability, that share should be less than one-third.

Examining the one-third allocation, I find it reasonable considering the underlying record. Carquest Corporation, innocent or not, had become Mechin's primary target. Its liability was potentially greater than that of BWP or CPI. Thus, equal responsibility for the settlement was in no way inequitable.

### 4. Peerless's claim against Hartford for breach of its fiduciary duty to Carquest Corporation and Peerless

In its Complaint, Peerless bought a claim against Hartford for breach of its insurance contract, breach of its fiduciary duty, and negligent control and management of the defense. Peerless makes the broad argument that "Hartford should not benefit from the muddled record that it created." (DE 264 p. 50). By consolidating the defense of the Carquest entities, Hartford allegedly permitted the lines between the entities to be blurred. Had Hartford properly done its job, Peerless argues, it would have separately assigned Carquest Corporation counsel and argued that Carquest Corporation, unlike CPI and BWP, was not involved in the marketing, labeling, or distribution of the Trouble Light.[14]

Here, Peerless relies on *Wolpaw v. Gen. Acc. Ins. Co.*, 639 A.2d 338, 339 (N.J. Sup. Ct. App. Div. 1994). In *Wolpaw*, a plaintiff brought suit against his eleven-year-old neighbor for shooting him in the eye with a rifle. *Id.* Also named as defendants were the child's mother and aunt. *Id.* All three defendants were insured under the same homeowner policy. *Id.* The insurer assigned the defense of all three to the same law firm. *Id.* The law firm successfully moved to have the mother dismissed from the action. *Id.* at 340. The boy and his aunt then split their share of the judgment, which exceeded the policy limits by $450,000. *Id.* Reviewing the conduct of the defense, the court held that the mother, the aunt, and the boy had conflicting interests. *Id.* For example, it was in the mother's interest to be dismissed from the action, but it was in the aunt's interest that the mother remain and split the judgment. *Id.* Or it was in the aunt's interest to argue that she had safely secured the rifle, while it was in the nephew's interest to assert that she had negligently failed to do so. *Id.* And so on. The court held that "[w]here conflicting interests impose on a liability insurer the duty to provide multiple insureds with separate counsel, it may be

---

[14] As discussed *supra*, I have already disposed of Peerless's estoppel arguments.

that in a particular case the separate attorneys would manage the case the same way as one attorney representing all insureds." *Wolpaw*, 639 A.2d at 340.

I find that the situation at hand differs from *Wolpaw* in several respects.

First, I am not convinced that Hartford was presented with a situation in which the Carquest entities had conflicting interests and therefore required separate counsel. Hindsight of course is 20/20, but at the outset, all three entities asserted the primary defense that they were *all* innocent sellers of a product manufactured by another. Hartford, operating on that basis, assigned all three entities to the same counsel, who pursued to that primary, innocent-seller defense. Any conflict of interest was contingent at best.

Second, I note that the defendants and the insurers involved in this matter were all sophisticated parties. After being assigned to Mulcahy (and then Maucher), all three Carquest entities participated in that joint defense without objection. Client contacts such as Kotcher and Herman certainly seemed to be speaking for multiple Carquest entities, without objection. Herman participated in preparing every Carquest entity witness for deposition, and the dissemination of information about the progress of the case seems to have been adequate.

In the summer of 2010, it became apparent that at least some of the Carquest entities were involved in the marketing and distribution of the light. Peerless asserts that it "painstakingly" combed through the Mechin record to demonstrate that Carquest Corporation in particular did not participate in marketing or distributing the Trouble Light. It may be that there was ample evidence that Carquest Corporation did not participate in the marketing and distribution of the Trouble Light. There was also, however, plenty of evidence, much of it from the mouths of Carquest-entity witnesses, that it did.

Perhaps, during the course of the summer 2010 depositions, a *potential* conflict began to brew—if any of the entities were not innocent sellers, the argument runs, then perhaps they should have begun to point fingers at each other. A reasonable lawyer (including in-house counsel for the entities) could have concluded, however, that this would not benefit any of the entities,

particularly Carquest Corporation. Had the defense strategy been further split, then the proverbial circular firing squad would begin—and this was explicitly recognized at the time. Carquest Corporation, the namesake of the Carquest Trouble light—and, confusingly, the party to which virtually every witness seemed to be referring when using the term "Carquest"—would be up for a hard fight before a jury. As Maucher would realistically conclude, Carquest Corporation was going to be the plaintiff's main target and, possibly, the focus of the jury's disdain. A jury trial, in his estimation, was likely to lead to a far higher award, perhaps in the $15 million range. Such a verdict would have engulfed any advantage that one Carquest entity (or its carrier) might have gained vis-à-vis the others.

When Maucher moved for summary judgment, he made the innocent seller argument. In the alternative, he moved to dismiss CPI and BWP, but not Carquest Corporation. That arguably, if contingently, placed Carquest Corporation's interests in conflict with those of CPI and BWP. Nevertheless, when Peerless sought to have Maucher fired, Kotcher, who had supported the joint defense all along, reported that the powers-that-be at Carquest Corporation had decided to keep Maucher on the case. Thus Maucher's clients went along with the joint defense.

Peerless may argue that, whether Carquest Corporation agreed or not, Hartford still breached a duty to Peerless by not splitting the defense at the point of summary judgment or perhaps even earlier. Peerless, however, is no less sophisticated than Hartford. Not until March 2010 did Peerless speak up on Carquest Corporation's behalf. If Peerless had been so confident in this position all along, it could have asserted it. Peerless, although it monitored the entire case, including Maucher's status reports, briefs, and settlement memos, was very tardy in taking issue with the Carquest entities' being represented and referred to in the collective. Nothing stood in the way of Peerless representing its own insured and managing its own defense throughout the entire action. Instead, Peerless—perhaps placing too much reliance on the

flimsy indemnification agreement—decided to relinquish its primary insured's defense.

In sum, I am not persuaded that Hartford acted negligently or in breach of any duty to Carquest Corporation or Peerless. Thus, Peerless's remaining counterclaims against Hartford are dismissed.

## III. CONCLUSION

Based upon the findings of fact and conclusions of law set forth above, as well as prior decisions of the Court, this Court finds that Peerless must provide Hartford with the one-third of the defense costs and one-third of the settlement owed from the Mechin action. Peerless's claim for contribution is dismissed.

An appropriate order follows. The parties shall confer and, within seven days, submit any final form of order and judgment necessary to dispose of the case.

Dated: September 30, 2019

Kevin McNulty
United States District Judge